## Docket No. 24-6150

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

KELLYE CROFT,

*Plaintiff-Appellant,*

v.

JAMES DOLAN, et al.,

*Defendants-Appellees.*

*Appeal from a Decision of the United States District Court for the Central District of California, Los Angeles · No. 2:24-cv-00371-PA-AGR · Honorable Percy Anderson*

## BRIEF OF PLAINTIFF-APPELLANT

KEVIN MINTZER
(km@mintzerfirm.com)
LAW OFFICE OF
  KEVIN MINTZER, P.C.
1350 Broadway
Suite 1810
New York, MY 10018
(646) 843-8180

OMAR H. BENGALI
(obengali@girardbengali.com)
GIRARD BENGALI, APC
355 S Grand Avenue
Suite 2450
Los Angeles, CA 90071
(323) 302-8300

DOUGLAS H. WIGDOR
(dwigdor@wigdorlaw.com)
MEREDITH A. FIRETOG
(mfiretog@wigdorlaw.com)
WIGDOR LLP
85 5th Avenue, 5th Floor
New York, NY 10003
(212) 257-6800

*Attorneys for Appellant Kellye Croft*



PRINTED ON RECYCLED PAPER



# TABLE OF CONTENTS

<b>Page</b>

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION .............................................................................. 1

JURISDICTIONAL STATEMENT ..................................................... 4

ISSUES PRESENTED......................................................................... 4

STATEMENT OF THE CASE............................................................. 5

    I.    Background Regarding Croft and Dolan.............................. 5

    II.    Dolan Coerces Croft into Unwelcome Sexual Contact........ 7

    III.    Dolan and the Azoff Entities Traffic Croft to California..... 9

    IV.    Dolan Coordinates a Meeting Between Croft and Harvey Weinstein............................................................................. 12

    V.    Procedural History.............................................................. 13

SUMMARY OF THE ARGUMENT ................................................... 16

STANDARD OF REVIEW ................................................................. 18

ARGUMENT ..................................................................................... 19

    I.    THE DISTRICT COURT ERRED IN HOLDING THAT CROFT DID NOT ALLEGE A COMMERCIAL SEX ACT AND THUS DID NOT PLAUSIBLY ALLEGE SEX TRAFFICKING CLAIMS AGAINST THE DOLAN DEFENDANTS.................................................................... 19

        A.    Plaintiff Alleged a Commercial Sex Act Based on Her Receipt of Cash Payments and Travel Benefits........................ 21

        B.    Plaintiff Alleged a Commercial Sex Act Based on Dolan's Promises of Career Assistance .................................... 26

    II.    THE DISTRICT COURT ERRED IN HOLDING THAT CROFT DID NOT PLAUSIBLY ALLEGE BENEFICIARY LIABILITY AGAINST THE AZOFF DEFENDANTS.................... 29

i

A.    Plaintiff Alleged that the Azoff Defendants Should Have Known of Dolan's Sex Trafficking ................................. 30

B.    Plaintiff Alleged Constructive Knowledge Concerning Dolan's Use of Fraud and Coercion ......................................... 35

C.    Plaintiff Also Alleged Beneficiary Liability Based on a Theory of Agency/Vicarious Liability ..................................... 39

CONCLUSION ....................................................................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A. B. v. Salesforce.com, Inc.*,
  2021 WL 3616097 (S.D. Tex. 2021) .............................................................. 32, 34

*A.B. v. Marriott Int'l, Inc.*,
  455 F. Supp. 3d 171 (E.D. Pa. 2020) ............................................................ 29, 31

*Acevedo v. Exp. Realty, LLC*,
  713 F. Supp. 3d 740 (C.D. Cal. 2024) .......................................................... 26, 31

*Ardolf v. Weber*,
  332 F.R.D. 467 (S.D.N.Y. 2019) ........................................................................ 37

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................... 18

*Bates v. Sequel Youth & Fam. Servs., LLC*,
  No. 2:23 Civ. 01063 (RDP), 2024 WL 3316989
  (N.D. Ala. July 5, 2024) ..................................................................................... 33

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................. 18, 24, 27

*David v. Weinstein Co. LLC*,
  431 F. Supp. 3d 290 (S.D.N.Y. 2019) ............................................................... 28

*Ditullio v. Boehm*,
  662 F.3d 1091 (9th Cir. 2011) ........................................................................... 19

*Doe #1 v. Red Roof Inns, Inc.*,
  21 F.4th 714 (11th Cir. 2021) ............................................................................ 31

*Doe (S.A.S.) v. ESA P Portfolio LLC*,
  No. 3:23 Civ. 06038 (TMC), 2024 WL 3276417
  (W.D. Wash. July 2, 2024) ................................................................................. 34

*Doe v. Scottsdale Inns LLC*,
  No. 23 Civ. 00759 (PHX) (JJT), 2024 WL 3494375
  (D. Ariz. July 22, 2024) ..................................................................................... 34

*Eckhart v. Fox News Network, LLC*,
   No. 20 Civ. 5593 (RA), 2021 WL 4124616
   (S.D.N.Y. Sep. 9, 2021) .................................................................... 25, 27

*Geiss v. Weinstein Holdings LLC*,
   383 F. Supp. 3d 156 (S.D.N.Y. 2019) ......................................................27

*Hawaiian Paradise Park Corp. v. Friendly Broad. Co.*,
   414 F.2d 750 (9th Cir. 1969) ..................................................................42

*Health Freedom Def. Fund, Inc. v. Carvalho*,
   104 F.4th 715 (9th Cir. 2024) .................................................................18

*Huett v. Weinstein Co. LLC*,
   No. 2:18 Civ. 06012 (SVW) (MRW), 2018 WL 6314159
   (C.D. Cal. Nov. 5, 2018) ........................................................................28

*In re Amergence Tech., Inc.*,
   No. 2:12 BK 35473 (RK), 2016 WL 4069550
   (Bankr. C.D. Cal. July 27, 2016) ...........................................................43

*In re ChinaCast Educ. Corp. Sec. Litig.*,
   809 F.3d 471 (9th Cir. 2015) ..................................................................43

*In re Maui Indus. Loan & Fin. Co.*,
   88 F. Supp. 3d 1175 (D. Haw. 2015) ......................................................43

*J.B. v. G6 Hospitality, LLC*,
   No. 19 Civ. 07848 (HSG), 2020 WL 4901196 (N.D. Cal. 2020) .........................29

*Jenni Rivera Enterprises LLC v. Cintas Acuario Inc.*,
   No. 2:23 Civ. 07847 (SB) (JC), 2024 WL 4799117
   (C.D. Cal. Oct. 28, 2024)........................................................................44

*Kekai Watanabe v. Derr*,
   115 F.4th 1034 (9th Cir. 2024)...............................................................18

*Lopez v. Apple, Inc.*,
   558 F. Supp. 3d 821 (N.D. Cal. 2021)....................................................34

*Martinez v. 189 Chrystie St. Partners, LP*,
   No. 22 Civ. 3111 (VEC), 2023 WL 5390442
   (S.D.N.Y. Aug. 22, 2023)................................................................. 25, 37

*Mavrix v. Photographs, LLC v. Livejournal, Inc.*,
   873 F.3d 1045 (9th Cir. 2017)................................................................42

iv

*Noble v. Weinstein*,
   335 F. Supp. 3d 504 (S.D.N.Y. 2018) .......................................................... 20, 28

*People v. JTH Tax, Inc.*,
   212 Cal. App. 4th 1219, 151 Cal. Rptr. 3d 728 (2013) .......................................40

*Roberts v. eXp Realty, LLC*,
   No. 2:23 Civ. 10492 (AB) (AGR), 2024 WL 3005892
   (C.D. Cal. May 23, 2024) ......................................................................... 21, 25

*Roe v. Howard*,
   No. 1:16 Civ. 562 (LOG), 2018 WL 284977
   (E.D. Va. Jan. 3, 2018), *aff'd*, 917 F.3d 229 (4th Cir. 2019) ...................... 25, 26

*S.Y. v. Naples Hotel Co.*,
   476 F. Supp. 3d 1251 (M.D. Fla. 2020) ..........................................................32

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) ........................................................................18

*Treminio v. Crowley Mar. Corp.*,
   649 F. Supp. 3d 1223 (M.D. Fla. 2023) ..........................................................24

*United States v. Bixler*,
   No. 21-5194, 2022 WL 247740 (6th Cir. Jan. 27, 2022) ...................................20

*United States v. Cook*,
   782 F.3d 983 (8th Cir. 2015) ..................................................................... 20-21

*United States v. Raniere*,
   55 F.4th 354 (2d Cir. 2022) ...................................................................... 20, 21

*United States v. Smith*,
   719 F.3d 1120 (9th Cir. 2013) ........................................................................36

*United States v. Taylor*,
   44 F.4th 779 (8th Cir. 2022) ..........................................................................36

*Vector Media S., LLC v. Starline Tours of Hollywood, Inc.*,
   No. 20 Civ. 6738 (DSF) (JC), 2020 WL 12035934
   (C.D. Cal. Dec. 2, 2020) .................................................................................41

*Whisper Soft Mills, Inc. v. N.L.R.B.*,
   754 F.2d 1381 (9th Cir. 1984) ........................................................................41

**Statutes & Other Authorities:**

18 U.S.C. § 1591 ................................................................ 4, 13, 20

18 U.S.C. § 1591(a) ................................................................ 19, 35

18 U.S.C. § 1591(a)(1) ................................................................20

18 U.S.C. § 1591(e)(2) ................................................................35

18 U.S.C. § 1591(e)(2)(B) ................................................................38

18 U.S.C. § 1591(e)(3) ................................................ 20, 21, 25, 26

18 U.S.C. § 1591(e)(5) ................................................................38

18 U.S.C. § 1595 ................................................................ 4, 13, 20, 31

18 U.S.C. § 1595(a) ................................................ 20, 29, 30, 34

28 U.S.C. § 1291 ................................................................4

28 U.S.C. § 1331 ................................................................4

28 U.S.C. § 1343 ................................................................4

Fed. R. App. Pro. 4(a)(1)(A) ................................................................4

Fed. R. Civ. P. 9(b) ................................................................31

Fed. R. Civ. P. 11 ................................................................14

Fed. R. Civ. P. 12(b)(6) ................................................ 13-14, 18

H.R. Rep. No. 108-264 ................................................................19

Pub. L. No. 106-386 § 102, 114 Stat. 1488 (2000) ................................19

Restatement (Third) of Agency § 1.01 ................................................40

Restatement (Third) of Agency § 3.03 ................................................42

Restatement (Third) of Agency § 7.08 ................................................42

*Constructive Knowledge*, Black's Law Dictionary (11th ed. 2019) .............31

Webster's Third New International Dictionary 904 (2002) ................................36

## **INTRODUCTION**

This appeal concerns the application of the Trafficking Victims Protection Reauthorization Act ("TVPRA") to claims of a young woman from Tennessee, a licensed massage therapist, who thought she was being offered legitimate work for a legendary rock band on tour, but was instead fraudulently induced to engage in unwelcome sex acts with the band's billionaire funder. In 2013, Plaintiff Kellye Croft believed she had received the break of a lifetime when Glenn Frey, a member of the Eagles, offered her a job to work as a massage therapist on their tour. At the time, Croft did not know that an important person in the Eagles' orbit was Defendant James Dolan, the billionaire business partner of Irving Azoff, the Eagles' long-time talent manager. Nor did she know that Dolan funded the joint enterprise with Azoff that allowed him to position his unremarkable band, JD and the Straight Shot ("JDSS" and collectively, with Dolan, "Dolan Defendants"), as the opening act for parts of the Eagles' tour.

Dolan's role on the tour meant that he could schedule massages with Croft. During his second massage with Croft in Miami, Dolan made aggressive sexual advances toward her. Croft had no interest in sexual contact with Dolan, who was twice her age. But Dolan refused to accept when Croft told him she wanted to keep their relationship professional. He grabbed Croft's hands, dragged her to a couch and forced her hands between his knees as he sat down. Though she continued

protesting his advances, Croft knew that Dolan had enormous power over her, and believed she had to submit to his sexual demands. From there began a pattern of sexual exploitation by Dolan.

Late in 2013, a representative of Azoff's companies—now known as Defendants Azoff Company Holdings LLC and The Azoff Company LLC ("Azoff Entities" or "Azoff Defendants," and collectively, with the Dolan Defendants, "Defendants")—extended Croft another invitation to join the Eagles tour in Los Angeles in January 2014. Croft did not know that Dolan or his band would be part of this leg of the tour and accepted. But after Croft had been flown out from Tennessee to Los Angeles, she learned that she was not staying at the same hotel as the Eagles, as had been the case earlier on the tour. Instead, her accommodation was in the same hotel with Dolan and JDSS. Soon enough, Croft discovered that she had been deceived about why she had been brought to Los Angeles. The Eagles did not need a massage therapist. Croft was being paid to satisfy the sexual demands of Dolan, who several times summoned her to his room on the pretense of receiving a massage, when in reality he wanted sex.

The trauma that Plaintiff endured at the hands of the Defendants falls squarely within the broad and remedial ambit of the TVPRA. Yet the District Court, even after Croft twice amended her complaint, held that Plaintiff did not state a sex trafficking claim against Defendants because she did not sufficiently allege that she

engaged in a "commercial sex act," an essential element of the claim. According to the District Court, whether Croft received something of value because she engaged in sex acts with Dolan was "speculative" and could not survive a motion to dismiss. But the District Court failed to apply the proper standards in evaluating Croft's Second Amended Complaint ("SAC"), which plausibly alleged that she received multiple things of value in exchange for sex with Dolan, including cash payments, airfare, a hotel stay, and promises of career support from Dolan.

Similarly incorrect were the District Court's other reasons for dismissing Plaintiff's claims against the Azoff Entities for benefitting from sex trafficking. Contrary to the Court's holding, Croft plausibly pleaded that the Azoff Entities knew or should have known that Dolan was engaged in a sex trafficking. The SAC alleged that the Azoff Entities turned a blind eye to multiple red flags that Dolan was exploiting Croft for sex, and Plaintiff was not required to allege that she complained to the Azoff Entities about Dolan's conduct to satisfy the standard for constructive notice. Finally, the District Court erred when it held that Croft did not sufficiently plead a theory of agency or vicarious liability that would impute Dolan's knowledge of his sex trafficking scheme on the Azoff Entities. In reaching this conclusion, the District Court's failed to credit the facts alleged in the SAC and misapplied agency law principles. Thus, for the reasons explained below, the Court should reverse the dismissal of Croft's claims and remand this case for discovery.

## **JURISDICTIONAL STATEMENT**

The District Court had jurisdiction over Plaintiff's sex trafficking claims, 18 U.S.C. § 1591 and 18 U.S.C. § 1595, under 28 U.S.C. §§ 1331 and 1343. The Court of Appeals has appellate jurisdiction under 28 U.S.C. § 1291 as Plaintiff appeals from a final decision of the District Court dismissing all of Plaintiff's claims, entered by the District Court on September 17, 2024. Plaintiff filed a notice of appeal on October 7, 2024, 7-ER-1186-1193, which was timely under Fed. R. App. Pro. 4(a)(1)(A).

## **ISSUES PRESENTED**

1. Whether the District Court erred in holding that Plaintiff did not plausibly allege the elements of a sex trafficking claim against Defendants because she did not sufficiently allege a "commercial sex act."

2. Whether the District Court erred in holding that Plaintiff did not plausibly allege the elements of a sex trafficking claim against the Azoff Entities on a beneficiary theory or vicarious liability theories.

## STATEMENT OF THE CASE[1]

### I.   Background Regarding Croft and Dolan

In 2013, Plaintiff Kellye Croft ("Croft" or "Plaintiff") was a 27-year-old licensed massage therapist running her own massage business in Tennessee. 3-ER-375 (¶¶ 23-24). That year, Glenn Frey of the well-known rock band, the Eagles, invited Croft to join the Eagles on tour as their massage therapist. 3-ER-375-76 (¶¶ 24-25). During the November 2013 leg of this tour, Croft regularly shared her business card with others backstage. 3-ER-377 (¶ 31). Croft once shared her card with James Dolan, the lead singer of the band J.D. and the Straight Shot ("JDSS") which was opening for the Eagles. *Id.* (¶ 32). At the time, Croft had never heard of Dolan. *Id.* She later learned that Dolan was in multiple business ventures with the Eagles' management company, Azoff Music Management, and that Dolan was a long-time business partner and significant funder of Azoff's businesses and of the tour itself.

In October 2013, Croft had a disagreement and several unpleasant interactions with the Eagles' tour manager, Tom Golseth. A few days later, Dolan, whom Croft did not know, scheduled a massage with Croft. 3-ER-378 (¶ 33). At the time, Croft

---

[1]     Unless otherwise noted, citations are to the paragraphs in Plaintiff's Second Amended Complaint ("SAC"), located in the Excerpts of Record at pages 367 to 408.

was still upset about the disagreement she had with Golseth, which had since become a topic of conversation with others on the tour. *Id.* Dolan noticed how upset Croft was and asked her what was wrong. *Id.* ¶ 34. Croft explained to Dolan what happened with Golseth and Dolan responded, "I will make sure this is taken care of." *Id.* Not long after that, Frey called Croft and apologized repeatedly and profusely to her for the situation with Golseth. 3-ER-379-80 (¶ 36). Croft found this behavior extremely out of character for Frey. *Id.* She later learned that the Eagles fired Golseth from the tour. *Id.*

Unbeknownst to Croft at the time, besides performing in the band that opened for the Eagles, Dolan helped lead a joint venture between the Eagles, JDSS, and the Azoff Entities. 3-ER-378-379 (¶ 35). In particular, Dolan was a business partner in Azoff MSG Entertainment LLC (currently known as Defendant The Azoff Company LLC and, hereinafter, "MSG Entertainment") alongside entertainment executive Irving Azoff. *Id.* Dolan co-founded MSG Entertainment with Azoff in September 2013 by contributing $175,000,000 to the venture. *Id.*, 3-ER-401-2 (¶¶ 35, 120). The other contribution to this joint venture came from Azoff Music Management, LLC (currently known as Defendant "The Azoff Company Holdings LLC," and, hereinafter, "Music Management"). 3-ER-374 (¶ 18). Speaking about this joint venture, Dolan said publicly that Azoff "was going to run everything," that Dolan

6

would be a "partner," and that Dolan would exercise corporate control over the joint venture in lieu of a board of directors. 3-ER-378-79 (¶ 35).

This joint venture, MSG Entertainment, managed the tour of the Eagles and JDSS. *Id.*, 3-ER-401-2 (¶¶ 35, 120). Dolan's position allowed him to take control on the tour. 3-ER-380 (¶ 39). This included exercising authority over issues related to MSG Entertainment's reopening of the Forum venue in Los Angeles, and the accompanying tour of the Eagles. *Id.* Dolan and Irving Azoff's close business relationship helped Irving Azoff maintain his influence in the music industry, at a time when he was restricted by covenant from taking on new artist management. 3-ER-385 (¶ 55). Through his contribution to MSG Entertainment, Dolan was also able to place his mediocre band, JDSS, as the opening act for the infinitely more famous Eagles. 3-ER-377-79 (¶¶ 32, 35).

## II.    **Dolan Coerces Croft into Unwelcome Sexual Contact**

In mid-November 2013, Croft joined the Eagles in Miami for another part of its tour. 3-ER-379-80 (¶¶ 36-37). Croft continued to feel ostracized by others because she was being blamed for Golseth's firing. *Id.* During this trip, Dolan scheduled his second massage with Croft. *Id.* Dolan asked Croft how the situation concerning Golseth had evolved, and Croft noted that Frey had apologized to her. *Id.* Dolan responded, "I told you it would be taken care of," insinuating that he was the one who caused Frey to apologize to her. *Id.* Dolan also repeatedly promised to

bring her on other legs of the tour, demonstrating that he had full discretion over staffing matters. 3-ER-380 (¶ 39). Croft thus began to understand the power Dolan had on the tour. *Id.* ¶ 38. Towards the end of the massage, Dolan pulled Croft towards him. 3-ER-381 (¶ 40). She tried to push him away. *Id.* Croft said she was very uncomfortable, that she took her job as a licensed massage therapist very seriously and that she wanted to remain professional. *Id.*

Croft tried to end the massage, but Dolan became even more insistent, treating Croft's resistance as part of a challenge or a game. *Id.* (¶ 41). Dolan then grabbed Croft's hands, dragged her to a couch in the same room and forced her hands between his knees as he sat down. *Id.* (¶ 42). Croft was adamant that she did not want to have any sexual interactions with Dolan, who was married at the time and over thirty years older than her. *Id.* But Dolan was extremely assertive and pressured Croft into unwanted sexual intercourse with him. *Id.* (¶ 43).

Croft felt disgusted and terrified, but a combination of factors led her to submit to Dolan's advances. *Id.* These included the extreme isolation she felt from others on the tour, Dolan's assertions that he would take care of her, and her recognition that this man held immense power over everyone's position on the tour—including hers. *Id.* Following this unwanted sexual contact, Croft was summoned to Dolan's room multiple times during the remainder of the Miami leg of the tour. 3-ER-382 (¶

44). On each of these occasions, Dolan made unwelcome advances toward Croft, and she felt obligated to submit to sex with him. *Id.*

Dolan was extremely manipulative, constantly reminding Croft of the way he "fixed" the situation with Golseth for her. *Id.* (¶ 45). Croft was disgusted by Dolan, but her youth and extreme loneliness while on the road with strangers, as well as Dolan's immense power, made it possible for Dolan to manipulate Croft and lure her under his control. *Id.* (¶ 46).

## III.  **Dolan and the Azoff Entities Traffic Croft to California**

Around the end of 2013, Croft received a request from the Azoff Entities to join the Eagles tour in Los Angeles, California, which she accepted. *Id.* (¶ 47). Although Croft understood that she was being flown out to California by the Azoff Entities to work for the Eagles and Frey, she later learned that she was working for both the Eagles and Dolan. 3-ER-382-83 (¶ 48). Marc Robbins, an agent of the Azoff Entities, forwarded Croft an email that suggested her flight to California would be expensed on "the JD credit card," referring to James Dolan and/or JDSS. *Id.*

Croft thought it was strange that she was invited to Los Angeles, as normally when the Eagles were in a major city, the band members were too busy to schedule massages with her. 3-ER-383 (¶ 49). Frey also lived in California and had another

masseuse on call in Los Angeles, so did not need Croft's services. *Id.* Still, Croft was grateful for the work and accepted the invitation. *Id.*

Croft had no reason to believe the Eagles would not require her massage services on this tour. *Id.* (¶ 50). In booking her travel, Robbins told her that "I'll need you at the show Monday afternoon." *Id.* Robbins personally transported Croft from The Peninsula Hotel to The Forum on days when shows were scheduled. *Id.* (¶ 51). At the time, Croft did not know that Dolan and JDSS would be opening for the Eagles in Los Angeles. 3-ER-384 (¶ 52).

When Croft arrived in Los Angeles, the Azoff Entities, including Robbins, arranged for Croft to be picked up at the airport by a security guard for the Eagles, whom Croft knew from previous shows. 3-ER-386 (¶ 58). The security guard brought her to stay at The Peninsula Hotel in Beverly Hills. *Id.* Although the arrangements until that point were typical of the other tour stints she had joined with the Eagles, she soon learned that the trip to Los Angeles was very different. *Id.* Unlike the other tour stints that she joined with the Eagles, for example, Croft was not housed at the same hotel as the band and the other tour staff; instead, she was at the same hotel as Dolan and JDSS. *Id.*

Croft was given a room to perform massages at The Forum, the newly re-opened venue funded by Irving Azoff and James Dolan, where she spent most of her time alone. 3-ER-387 (¶ 60). Almost no tour members signed up for massage

appointments. *Id.* Indeed, Croft did not perform a single massage on any member of the Eagles while working at The Forum, despite ostensibly being flown to California for that very purpose, and later receiving "venue pay" of $700 per day from the Eagles through the Azoff Entities. *Id.* (¶ 61).

Although the Azoff Entities purported to fly Croft to California to perform legal massage services, in reality, Croft was flown out to Los Angeles, at Dolan's request, to satisfy his sexual demands. 3-ER-387-88 (¶ 62). On evenings when there was no show scheduled at The Forum, Croft would stay alone in her room at the Peninsula until she was inevitably called to Dolan's room for a "massage" or to "work on [him.]" 3-ER-388 (¶ 64). On these occasions, Dolan never truly wanted only a massage, but expected sexual favors. *Id.* Croft did not want to have sexual contact with a man twice her age whom she did not find attractive. 3-ER-389 (¶ 67). But given Dolan's power, she was terrified of upsetting him by rejecting his sexual demands. *Id.* She understood that doing so would jeopardize her work with the Eagles and future opportunities to work for professional musicians. *Id.* He also repeatedly offered promises of future work if she went along with his advances. 3-ER-380, 382, 401 (¶¶ 39, 45, 119).

The Azoff Entities understood that Croft was present at Dolan's behest and that she performed few, if any, massages. 3-ER-387-88 (¶¶ 60-62). The Azoff Entities nonetheless paid Croft as though she were an employee. 3-ER-388-89 (¶¶

11

65-66). But the nature of their deception—the pretense of legitimate work and promises for more, fraudulently bent into demands for sex—was an open secret. For instance, after Dolan bragged to his bandmates about what he was doing, another band member went to Croft pretending to want a massage, only to then ask for sexual favors. 3-ER-390-91 (¶ 72).

## IV.   Dolan Coordinates a Meeting Between Croft and Harvey Weinstein

Dolan also wanted Croft in Los Angeles so she could be exploited by his close friend, Harvey Weinstein. Early in 2014, Dolan encouraged Croft to go shopping and have dinner with two female assistants from Irving Azoff Management. 3-ER-391 (¶ 73). When she returned to the Peninsula holding a to-go box for Dolan a large man joined her in the elevator and asked, "who is that to-go box for?" *Id*. (¶¶ 74-75). When Croft responded it was for Dolan, the man began gushing that Dolan was his friend and had said great things about Croft as a massage therapist. 3-ER-391-92 (¶¶ 75-76). The man then introduced himself as Harvey Weinstein and began telling Croft that there were opportunities for her as a masseuse on his movie sets. 3-ER-392 (¶ 78). She responded that she would be happy to discuss such a role and, at Weinstein's suggestion, joined him in his suite to do so. *Id*. (¶¶ 79-81).

The meeting took a turn when Weinstein first tried to get Croft to try on clothes in front of him and then tried to get her to give him a massage. 3-ER-392-94 (¶¶ 82-87). Weinstein also took increasingly aggressive steps to force Croft to

12

massage him, then tried to block Croft's escape from the room. 3-ER-394-95 (¶¶ 88-94). He relented and let her go, but then followed her down the hallway to her room, forcibly pushed her door open, pushed her onto a bed, forced her legs open, digitally penetrated her while holding her down, then tried to force his penis inside her. *Id.* (¶¶ 89-92). As she struggled, Dolan called her and she picked up the phone, finally prompting Weinstein to leave her room. 3-ER-396-97 (¶¶ 95-101). As Weinstein left, he warned Croft that Dolan was "going to be very disappointed [she] led [him] on." *Id.* (¶ 101). After Croft made her way to Dolan and told him what happened with Weinstein, he admitted he had known that Weinstein had "serious issues," was a "troubled person" and not was "safe," though showed little empathy towards her. 3-ER-397 (¶ 104).

## V.    **Procedural History**

Croft filed her initial Complaint on January 16, 2024, asserting claims of sex trafficking in violation of 18 U.S.C. § 1591 and 18 U.S.C. § 1595 under theories of perpetrator liability against the "Dolan Defendants" and beneficiary liability against the Azoff Entities. Plaintiff also asserted California common law claims against Harvey Weinstein and Dolan for sexual assault/forcible touching and a separate claim against Dolan for aiding and abetting Weinstein's sexual assault and forcible touching of her. 7-ER-1155-85. On March 25, 2024, the Dolan Defendants and Azoff Entities moved to dismiss Croft's initial Complaint under Fed. R. Civ. P.

12(b)(6), arguing that Plaintiff did not sufficiently allege claims under the TVPRA or under California law. Separately, on the same day, the Azoff Entities filed a motion for sanctions against Plaintiff pursuant to Fed. R. Civ. P. 11.

On April 10, 2024, Croft filed her First Amended Complaint ("FAC") asserting the same claims she brought in her initial Complaint. 5-ER-811-48. On April 24, 2024, the Dolan Defendants and Azoff Entities moved to dismiss Croft's FAC. 4-ER-580-611; 5-ER-613-810. On June 21, 2024, the District Court granted Defendants' motions to dismiss ("First Order"). The District Court held that Plaintiff had not sufficiently alleged a "commercial sex act" within the meaning of the statute, and thus did not state a perpetrator liability sex trafficking claim against the Dolan Defendants, because Croft allegedly did not plead that anyone gave or received things of value on account of a sex act. 3-ER-417. The District Court also held that Plaintiff did not sufficiently allege that the Azoff Entities had the "requisite knowledge that Dolan was using fraud or coercion to obtain sex" from Plaintiff, under a TVPRA beneficiary theory of liability. *Id*. The District Court further held that Dolan's knowledge could not be imputed to the Azoff Entities because the FAC did not properly allege an agency or vicarious liability theory. 3-ER-417-18. The District Court dismissed Plaintiff's TVPRA claim with leave to amend. The District Court deferred ruling on Plaintiff's state law claims until Plaintiff could assert a viable federal law claim. 3-ER-418. Finally, the District Court denied the Azoff

Entities' motion for sanctions finding that it was "unable to conclude that Plaintiff's claim is baseless and made without a reasonable inquiry." 3-ER-419.

On July 8, 2024, Plaintiff filed the SAC, asserting the same claims against Defendants from her previous complaints, but adding facts that addressed the District Court's First Order. On July 22, 2024, the Dolan Defendants and Azoff Entities moved to dismiss Plaintiff's SAC, reasserting similar arguments that they made against the FAC. On September 17, 2024, the District Court granted the Dolan Defendants' and the Azoff Entities' motions to dismiss Plaintiff's SAC without leave to amend. 1-ER-4-12 ("Second Order"). In dismissing the SAC, the District Court held that, with respect to perpetrator liability under the TVPRA, the SAC did not allege a commercial sex act because Plaintiff did not sufficiently plead a causal connection between the "things of value" she received from the Dolan Defendants and her sexual relationship with Dolan. 1-ER-7. In granting the Azoff Entities' motion to dismiss the SAC, the District Court also held that Plaintiff did not sufficiently allege a claim for beneficiary liability under the TVPRA because the SAC did not establish that the Azoff Entities had "the requisite knowledge that Dolan was using force or coercion" to engage in a commercial sex act with him. 1-ER-9. The District Court also held that the SAC did not sufficiently allege an agency or vicarious liability theory to impute Dolan's knowledge of sex trafficking to the Azoff Entities. 1-ER-10. Finally, because the District Court dismissed the only

federal claims which gave it subject matter jurisdiction over the SAC, the court declined to exercise supplemental jurisdiction over Plaintiff's state law claims, and did not otherwise rule on the sufficiency of Plaintiff's SAC with respect to those claims.

On October 7, 2024, Plaintiff timely filed a notice of appeal appealing the District Court's September 17, 2024 order granting the Dolan Defendants' and Azoff Entities' motions to dismiss the SAC. 7-ER-1186-93.

## SUMMARY OF THE ARGUMENT

The District Court erroneously held that Plaintiff did not allege a "commercial sex act" because there was no causal connection between the sex acts she engaged in with Dolan and her receipt of anything of value. On the contrary, Plaintiff sufficiently alleged that she received multiple "things of value" because she had sex with Dolan—including air travel, lodging, and cash payments for what Defendants had fraudulently led her to believe were legitimate massage services. In holding that Croft's claim was speculative because she may have received these "things of value" for nonsexual services, the District Court improperly imposed its own interpretation of the facts, contrary to the governing standards on a motion to dismiss. The District Court also ignored multiple well-pleaded allegations—including that Croft performed not a single massage for the Eagles in Los Angeles, despite ostensibly being hired for that purpose—making it likely, not merely plausible, that Croft was

16

paid for sex with Dolan. The District Court further erred in rejecting the claim that Dolan's promises to Croft of career assistance in exchange for sex were insufficient to establish a commercial sex act. In so holding, the District Court again erroneously adopted its preferred interpretation of the facts and disregarded Croft's allegation that she submitted to sex with Dolan because she understood that rejecting him would jeopardize her work with the Eagles and future career opportunities that Dolan had offered to her.

Next, the District Court erred when it found that the Azoff Defendants—the corporate entities who helped Dolan perpetrate the fraud on Plaintiff—were not liable for sex trafficking because Plaintiff did not sufficiently plead that they knew or should have known that they were benefiting and participating in the sex trafficking fraud. The District Court incorrectly applied an "actual knowledge" requirement, where here, the facts established sufficient red flags to suggest that the Azoff Defendants at the very least "should have known" that they were transporting and compensating Plaintiff at Dolan's behest for services that she did not actually provide. Plaintiff also sufficiently alleged the Azoff Defendants were liable under theories of vicarious liability and agency, where the SAC pleaded that Dolan served as an agent of the Azoff Entities and exercised actual and/or apparent authority that he used to engage in the fraudulent venture that forms the basis of Plaintiff's claims.

17

For these reasons and explained below, this Court should reverse the decision below, and allow the case to proceed to discovery.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of a motion to dismiss. "Dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is appropriate only if the complaint fails to allege enough facts to state a claim to relief that is plausible on its face." *Kekai Watanabe v. Derr*, 115 F.4th 1034, 1037 (9th Cir. 2024) (internal quotation omitted). The Court must accept a complaint's factual allegations as true, although the same does not apply to legal conclusions. *Health Freedom Def. Fund, Inc. v. Carvalho*, 104 F.4th 715, 722 (9th Cir. 2024). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (internal quotations omitted). Thus, "if there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)

18

**ARGUMENT**

**I.** **THE DISTRICT COURT ERRED IN HOLDING THAT CROFT DID NOT ALLEGE A COMMERCIAL SEX ACT AND THUS DID NOT PLAUSIBLY ALLEGE SEX TRAFFICKING CLAIMS AGAINST THE DOLAN DEFENDANTS**

Congress passed the Trafficking Victims Protection Act ("TVPA") in 2000 for the purpose of "combat[ing] trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." *Ditullio v. Boehm*, 662 F.3d 1091, 1094 (9th Cir. 2011) (*quoting* Pub. L. No. 106-386, § 102, 114 Stat. 1488 (2000)). The statute makes it a federal crime to knowingly:

> recruit[ ], entice[ ], harbor[ ], transport[ ], provide[ ], obtain[ ] or maintain[ ] by any means a person . . . knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion . . . or any combination of such means will be used to cause the person to engage in a commercial sex act.

*Ditullio*, 662 F.3d at 1094 (quoting 18 U.S.C. § 1591(a)).

In 2003, Congress reauthorized the TVPA and amended it to "enhanc[e] provisions on prevention of trafficking, protection of victims of trafficking, and prosecution of traffickers." *Id.* (quoting H.R. Rep. No. 108-264 (I), at 8 (2003)). As part of the Trafficking Victims Protection Reauthorization Act, Congress added a private right of action for trafficking victims. That provision provides:

> An individual who is a victim of a violation may bring a civil action against the perpetrator (or whoever knowingly

19

> benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a).

To state a claim against alleged perpetrators of sex trafficking under 18 U.S.C. §§ 1591 and 1595, Plaintiff must allege that Defendants knowingly and in interstate or foreign commerce: "(1) recruit[ed], entice[d], harbor[ed], transport[ed], provide[d], obtain[ed], advertise[d], maintain[ed], patronize[d], or solicit[ed] by any means a person; (2) knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion . . . or any combination of such means will be used'; (3) 'to cause the person to engage in a commercial sex act.'" 18 U.S.C. § 1591(a)(1); *see also United States v. Bixler*, No. 21-5194, 2022 WL 247740, at *19 (6th Cir. Jan. 27, 2022); *Noble v. Weinstein*, 335 F. Supp. 3d 504, 515 (S.D.N.Y. 2018).

The District Court wrongly dismissed Croft's sex trafficking claim against the Dolan Defendants for the sole reason that Croft did not plead a "commercial sex act." The TVPRA defines "commercial sex act" as "any sex act on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3). "On account of" is synonymous with "because of." *See United States v. Raniere*, 55 F.4th 354, 363 (2d Cir. 2022). The phrase, "anything of value" is interpreted broadly and not limited to monetary compensation. *Raniere*, 55 F.4th at 363; *United States*

20

*v. Cook,* 782 F.3d 983, 988 (8th Cir. 2015) ("The phrase 'anything of value' [in Section 1591(e)(3)] is extremely broad."). A "commercial sex act" is thus properly pleaded under the TVPRA where a plaintiff alleges that "any person" received "anything of value" because of a sex act. *See Raniere*, 55 F.4th at 363 (approving jury instruction in which "commercial sexual act" is defined as "any sex act of which anything of value is given to or received by any person because of such sex act"). But a commercial sex act "does ***not*** require a bargained for exchange." *Roberts v. eXp Realty, LLC*, No. 2:23 Civ. 10492 (AB) (AGR), 2024 WL 3005892, at *10 (C.D. Cal. May 23, 2024). "The coexistence of the sex act and the thing of value is the exchange necessary to satisfy a commercial sex act." *Id.*

Here, there is no dispute Croft engaged in "sex acts" with Dolan after she was transported to Los Angeles by the Dolan Defendants and the Azoff Entities. 3-ER-388-89 (¶¶ 64, 67). Croft also alleged that different "things of value" were given or received because she engaged in sex acts with Dolan, including: 1) Croft's receipt of cash payments and travel benefits; and 2) Dolan's promises to Croft of career support and professional opportunities. As explained below, the District Court erred in holding that neither category satisfied the commercial sex act requirement.

### A.  Plaintiff Alleged a Commercial Sex Act Based on Her Receipt of Cash Payments and Travel Benefits

Most directly, the SAC alleges that because she engaged in sex acts with Dolan, Croft received several payments and travel accommodations from the Dolan

Defendants and Azoff Entities. These payments included: "venue pay" of $700 per day when Croft went to The Forum, a separate payment of $8,400 from Dolan's tour manager, round trip airfare from Tennessee to Los Angeles, and a multi-night stay at a luxury hotel. 3-ER-387-89, 401 (¶¶ 62-67, 119). Yet the District Court held that it was "speculative" that Croft received cash payments and travel benefits for engaging in sex acts with Dolan, rather than receiving those valuables because she was hired for the Eagles tour as a masseuse. 1-ER-7. But multiple circumstances alleged in the SAC, unanalyzed by the District Court, make it plausible that Defendants provided money and travel benefits to Croft to engage in sex acts with Dolan.

To begin, Defendants' invitation to Croft for her to join the Eagles tour in Los Angeles in January 2014 should be considered in the context of the initial sexual contact between Croft and Dolan two months earlier when the tour was in Miami. At that time, Dolan used the pretense of a scheduled massage to physically force himself onto Croft even after she repeatedly told him that she was not interested and wanted to keep their interactions professional. 3-ER-380-81 (¶¶ 37-42). Dolan was extremely assertive and pressured Croft into having unwanted sexual intercourse with him. 3-ER-381 (¶ 43). After that initial incident, Dolan summoned Croft to his

22

hotel room on multiple other occasions on the Miami leg of the tour and similarly pressured her to have sex with him.

This context, ignored by the District Court, supports a finding that the real purpose behind the Dolan Defendants and Azoff Entities' invitation to Croft to join the Los Angles leg of the tour was so that she would have sex with Dolan. Having pressured Croft to submit to him in Miami, it is reasonable to infer that Dolan intended Croft to submit to him in Los Angeles as well. While the Los Angeles part of the Eagles tour was presented to Croft as a legitimate massage engagement, once she arrived in Los Angeles it quickly became apparent to Croft that she had been brought there under false pretenses. First, Croft was surprised to learn that Dolan was on the Los Angeles leg of the tour, something the Defendants had failed to mention. 3-ER-384 (¶ 52). What's more, unlike on past legs of the tour, Croft barely saw Frey or the other members of the Eagles and did not perform a single massage on any member of the Eagles while working at The Forum. 3-ER-387 (¶¶ 59, 61). And rather than stay at the hotel with the Eagles, as she had done on past legs of the tour, the Dolan Defendants and Azoff Entities arranged for her to stay at the Peninsula Hotel, where Dolan and JDSS were staying. 3-ER-386 (¶ 58). Once Defendants had induced Croft to fly to Los Angeles, Dolan resumed the predatory behavior he exhibited in Miami, summoning Croft to his hotel room, ostensibly for

massages but really so that Croft could provide him sexual favors on demand. 3-ER-387 (¶ 62).

Based on these facts, it is more than plausible that the pay and travel benefits the Dolan Defendants and Azoff Entities gave to Croft were causally connected to the sex acts Dolan coerced her to perform with him. In holding that such a conclusion was "speculative" because Croft had been hired as a masseuse for the Eagles tour and could have been paid for those professional services, the District Court imposed an improper pleading burden on Croft to prove that she was not paid for legitimate reasons. Whether the District Court believed it is more likely that Croft received things of value because she provided massage services is not the proper test for a motion to dismiss, where all reasonable inferences are given to Plaintiff. *See Twombly*, 550 U.S. at 556. The question before the District Court was whether there was sufficient factual content in the SAC to permit a reasonable inference that the Defendants provided Croft with money and travel benefits because she engaged in sex acts with Dolan. *Id.* The answer is "yes," particularly given that there was no genuine need for Croft's massage services in Los Angeles even though she was ostensibly brought to Los Angeles to perform those services for the Eagles, and, contrary to prior practice on the Eagles tour, Croft was placed in Dolan's hotel where she was easily accessible to be summoned by him for sex. *See Treminio v. Crowley Mar. Corp.*, 649 F. Supp. 3d 1223, 1231 (M.D. Fla. 2023) (defendant's alleged plan

to use a business opportunity to lure [plaintiff] into a vulnerable position where he could sexually assault her raises a reasonable inference that the things of value were received on account of the sex act).

While Croft does not allege that Defendants ever directly stated that they were paying her for having sex with Dolan, pleading such an explicit *quid quo pro* is not required. *See Roberts v. eXp Realty, LLC*, 2024 WL 30058092, at *10 (recognizing while the definition of "commercial sex act" "implies a causal connection between the sex act and the commercial exchange, it does not require a bargained for exchange. The coexistence of the sex act and the thing of value is the exchange necessary to satisfy a commercial sex act."); *Martinez v. 189 Chrystie St. Partners, LP*, No. 22 Civ. 3111 (VEC), 2023 WL 5390442, at *11 (S.D.N.Y. Aug. 22, 2023) ("The TVPA does not require "an explicit *quid pro quo* in order to establish that a sex act was "commercial""); *Eckhart v. Fox News Network, LLC*, No. 20 Civ. 5593 (RA), 2021 WL 4124616, at *30 (S.D.N.Y. Sep. 9, 2021)(same).

The District Court also erred in failing to consider the possibility that, even if Defendants paid Croft compensation and travel benefits to provide massage services, that would not mean she was not *also* paid to engaged in sex acts with Dolan. The TVPRA does not state that for a sex act to be commercial, a "thing of value" must be given "solely" on account of the sex act. 18 U.S.C. § 1591(e)(3). Indeed, a thing of value may be given to a trafficking victim for more than one reason. *See, e.g.*, *Roe*

25

*v. Howard*, No. 1:16 Civ. 562 (LOG), 2018 WL 284977, at *6 (E.D. Va. Jan. 3, 2018) (finding that domestic worker who was paid a monthly salary by her employer for her services, which included being subjected to forced sex acts, had properly pleaded a commercial sex act under the TVPRA), *aff'd*, 917 F.3d 229 (4th Cir. 2019). Thus, if the Defendants paid Croft for engaging in intercourse with Dolan, that would still constitute a commercial sex act even if a factfinder concluded that Defendants also paid Croft because she provided massage services during the Eagles' Los Angeles shows.

### B.  Plaintiff Alleged a Commercial Sex Act Based on Dolan's Promises of Career Assistance

The District Court further erred in holding that Croft's allegations that she received promises of career assistance from Dolan were insufficient to establish a commercial sex act. 1-ER-7. Croft alleged that "in exchange for [] sex acts with Dolan, Ms. Croft received promises from Dolan that she would be invited on the European leg of the Eagles tour, and that she could potentially receive work as a massage therapist for other musical tours that went through Dolan's Madison Square Garden arena in New York City." 3-ER-401 (¶ 119). As many courts have recognized, promises of career support or professional opportunities can be a "thing of value" under 18 U.S.C. § 1591(e)(3). *See Acevedo v. Exp. Realty, LLC*, 713 F. Supp. 3d 740, 772 (C.D. Cal. 2024) ("The TVPRA extends to enticement by means of fraudulent promises of career advancement that are made for the purpose of

engaging in consensual or nonconsensual sexual activity."); *see also Eckhart v. Fox News Network, LLC*, 2021 WL 4124616, at \*28 (holding that pledges of career support are "things of value" under the TVPRA); *Geiss v. Weinstein Holdings LLC*, 383 F. Supp. 3d 156, 168 (S.D.N.Y. 2019) ("Defendant's alleged fondling of Plaintiffs' genitals was commercial in nature because he offered them valuable career advancement, including future modeling jobs, to allow it to happen.").

While the District Court acknowledged that such promises could theoretically be a "thing of value" 1-ER-7, it dismissed Croft's TVPRA claim because, it held that Croft did not allege that she "was lured or enticed by promises of career advancement to engage in the sexual relationship with Dolan," *id.*,[2] and, thus could not satisfy the *Twombly* plausibility standard. But the District Court overlooked Croft's allegations that, "given Dolan's power, she was terrified of upsetting him by rejecting his sexual demands" and that she "understood that doing so would jeopardize her work with the Eagles and future opportunities to serve as a Licensed Massage Therapist for professional musicians." 3-ER-389 (¶ 67).[3] Thus, contrary

---

[2]      Contrary to the District Court's decision, Croft did *not* allege that she engaged in sex acts with Dolan because she had romantic feelings for him. Rather, she alleged that Dolan sometimes acted romantically *toward her*. 3-ER-389 (¶ 68). She also alleged that "did not want to have sexual and intimate contact with a man twice her age whom she did not find remotely attractive." *Id.* (¶ 67). The District Court ignored that allegation.

[3]      Beyond Dolan's power to control employment opportunities for the Eagles tour, 3-ER-378-79, 401-2 (¶¶ 35, 120), during the Miami leg of the Eagles tour,

to the District Court's holding, Croft did "directly allege[d] that she went to Dolan's room and continued to engage in a sexual relationship with him," 1-ER-7, to preserve the professional assistance and career opportunities that Dolan had offered her. This case is thus similar to those involving Harvey Weinstein in which courts have recognized that the opportunity to retain a relationship with a powerful person offering career assistance is a "thing of value" and supports the finding that a plaintiff was engaged in a commercial sex act. *See David v. Weinstein Co. LLC*, 431 F. Supp. 3d 290, 303 (S.D.N.Y. 2019) (plaintiff received a "thing of value" from a meeting to discuss a prospective acting job, even though she never ultimately received the role); *Noble*, 335 F. Supp. 3d at 521 ("The contention . . . that [plaintiff] was given nothing of value—that the *expectation* of a film role, of a modeling meeting, of '[Weinstein's] people' being 'in touch with her' had no value—does not reflect modern reality."); *Huett v. Weinstein Co. LLC*, No. 2:18 Civ. 06012 (SVW) (MRW), 2018 WL 6314159, at *8 (C.D. Cal. Nov. 5, 2018) (commercial sex act element satisfied where plaintiff alleged she "felt compelled to comply with Harvey Weinstein's acts toward her because of the benefits she would receive from his power and influence, including without limitation, a role on" a television show). For

---

Dolan had said to Croft that she would have opportunities for more work through him because he was the owner of Madison Square Garden and that many musical tours went through that venue and required massage services. 3-ER-382 (¶ 45).

this separate reason, Croft plausibly pleaded a commercial sex act and her TVPRA claim against the Dolan Defendants should be reinstated.

## II. THE DISTRICT COURT ERRED IN HOLDING THAT CROFT DID NOT PLAUSIBLY ALLEGE BENEFICIARY LIABILITY AGAINST THE AZOFF DEFENDANTS

The District Court also erred in finding that Plaintiff did not plausibly allege a claim against the Azoff Defendants for TVPRA beneficiary liability. To state a claim for beneficiary liability under Section 1595(a), a plaintiff must allege facts that allow a court to plausibly infer that defendants (1) "knowingly benefitted . . . financially or by receiving anything of value" (2) "from participation in a venture," (3) which it "knew or should have known" that "force, threats of force, fraud [or] coercion" would be used to cause a person to engage in a commercial sex act. *See A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 189 (E.D. Pa. 2020). A defendant need not commit an overt act that furthered the sex trafficking or have participated in the sex trafficking act itself. *J.B. v. G6 Hospitality, LLC*, No. 19 Civ. 07848 (HSG), 2020 WL 4901196, at *8 (N.D. Cal. 2020).

Initially, for the reasons stated in the preceding section, the District Court erred in dismissing Plaintiff's beneficiary liability claim because she did not allege the existence of a commercial sex act. 1-ER-7-8. Because Plaintiff does allege that she was given things of value in exchange for sex acts with Dolan, she does allege a

commercial sex act under the TVPRA, and thus the District Court should not have dismissed her beneficiary liability claim on that basis.

The District Court's alternative reasons for dismissing Croft's beneficiary liability claims against the Azoff entities were equally erroneous. As explained below, the court wrongly held that Plaintiff did not plausibly plead that the Azoff Entities knew or should have known that Dolan was engaged in a sex trafficking. The District Court also erred when it held that Croft did not sufficiently plead a theory of agency or vicarious liability that would impute Dolan's knowledge of his sex trafficking scheme to the Azoff Entities.

## A. Plaintiff Alleged that the Azoff Defendants Should Have Known of Dolan's Sex Trafficking

The SAC sufficiently pleaded that the Azoff Defendants benefited— financially and otherwise—from participation in James Dolan's venture. The District Court's decision turned on its analysis of the element of actual or constructive knowledge that the venture was engaged in sex trafficking, holding that there were no facts such as "a complaint or a disclosure . . . that would have given the Azoff Defendants notice that Dolan was using coercion in his sexual relationship with Plaintiff." 1-ER-9. But Croft was not required to plead that the Azoff Defendants had actual notice of Dolan's sex trafficking venture. Rather, it was sufficient that she allege facts supporting an inference that the Azoff Defendants "knew or *should have known*" about Dolan's trafficking. 18 U.S.C. § 1595(a)

(emphasis added). The District Court's requirement that that a victim affirmatively complain about being coerced into sex acts would "impose a 'knowingly' state of mind requirement to section 1595 and ignore language Congress specifically included allowing a civil action against facilitators who 'should have known' about a sex trafficking venture." *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d at 189.

Constructive knowledge "invokes a negligence standard," which is satisfied "along a spectrum." *Acevedo*, 713 F. Supp. 3d at 779-80. Likewise, Fed. R. Civ. P. 9(b) allows plaintiffs to plead knowledge "generally." *See, e.g.*, *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 725 (11th Cir. 2021) (in the context of the TVPRA, explaining that constructive knowledge is that knowledge which "one using reasonable care or diligence should have") (citing *Constructive Knowledge*, Black's Law Dictionary (11th ed. 2019)).

Under the TVPRA, constructive knowledge is pleaded through the existence of red flags that should have alerted defendants—or a reasonably prudent person in defendant's position—to the fact that the venture they are benefiting from or participating in is involved in sex trafficking. Thus, in cases involving a hotel's constructive knowledge of trafficking on its premises, courts have found allegations concerning, for example, multiple visitors to one hotel room, the presence of sex paraphernalia, and inappropriate appearance and physical deterioration of victims sufficient to infer that the hotel knew or should have known of a sex trafficking

venture. *See S.Y. v. Naples Hotel Co.*, 476 F. Supp. 3d 1251, 1257 (M.D. Fla. 2020) (collecting cases). While factual scenarios will vary, courts are required to consider the particular circumstances alleged to determine whether it is plausible that a defendant "was in a position to learn" about the illegal practices of their co-defendant. *A. B. v. Salesforce.com, Inc.*, 2021 WL 3616097, at *3 (S.D. Tex. 2021).

Here, the district court failed to draw reasonable inferences about the red flags that should have alerted the Azoff Defendants that Plaintiff was brought to Los Angeles to have sex with Dolan, not to perform legitimate massage services. In the SAC, Plaintiff alleged that she was flown out to California by the Azoff Entities, who confirmed that her flight would be charged to the "JD credit card." That fact gives rise to the reasonable inference that the Azoff Defendants knew that the request for Plaintiff's presence in California was made at Dolan's request, 3-ER-383-84 (¶ 47-48), particularly because during previous parts of the Eagles tour, travel arrangements were both made by *and paid for* by the Azoff Entities. 3-ER-384, 387 (¶¶ 53, 59). After all, why would "JD" be paying for the Eagles' masseuse? And, unlike during previous tour stints, after Dolan arranged and paid for Croft's transport to Los Angeles, Azoff Entity employees brought her to a separate hotel to stay with Dolan. 3-ER-384, 386-87 (¶¶ 53, 58-59). Meanwhile, the Azoff entities paid Croft $700 venue pay for her work on the "Eagles tour," while knowing that she was doing no legitimate work for anyone on the tour. 3-ER-387-89 (¶¶ 59, 65-66). Given that

these employees transported her and paid her, it is reasonable to infer they understood that Croft's presence as a massage therapist was a mere pretext and that Dolan was using his power and influence over her to induce her into unwanted sex. 3-ER-381, 389 (¶¶ 43, 67).

Further bolstering the conclusion that the Azoff Entities should have known that Croft was being trafficked was that Dolan made no secret to others on the tour that he was using Croft for sex and he encouraged others to similarly exploit her, including his bandmates and his good friend, Weinstein. 3-ER-390-91, 394, 398 (¶ 72, 87, 107). While the Azoff Entity employees involved in transporting Croft may profess ignorance that Dolan's intended to sexually exploit Croft, a factfinder could conclude that they ignored the multiple red flags. In particular, Croft had been transported at the behest of Dolan, was lodged with him unlike previous tour stints, and there was little to no work for her to perform on the Los Angeles leg of the Eagles tour. 3-ER-386-89 (¶¶ 58, 61-62, 65-66). *Cf. Bates v. Sequel Youth & Fam. Servs., LLC*, No. 2:23 Civ. 01063 (RDP), 2024 WL 3316989, at *8 (N.D. Ala. July 5, 2024) (allegations that camps had cut staff and that students in camps were performing maintenance were enough to put defendant on notice of trafficking).

Given the Azoff Entities' close personal ties with Dolan, compounded with their awareness of these abnormal circumstances surrounding the hiring of an employee whose job entailed being in isolated, intimate, one-on-one situations with

clients, the Azoff Entities were "in a position to learn" that Plaintiff was brought to California on fraudulent pretenses to engage in sex acts with Dolan. *A. B. v. Salesforce.com, Inc.*, 2021 WL 3616097, at *3 (S.D. Tex. 2021). There is no need for Plaintiff to allege that this knowledge was imputed from Dolan to the Azoff Defendants through an agency relationship. Given his close involvement with them and their operations, it is highly plausible that information was freely exchanged between them. But regardless, requiring Plaintiff to plead such specific details about knowledge, which are uniquely within Defendants' possession, is inconsistent with the pleading requirements of the Federal Rules of Civil Procedure. *See, e.g.*, *Lopez v. Apple, Inc.*, 558 F. Supp. 3d 821, 826 (N.D. Cal. 2021).[4]

---

[4] It is therefore not a requirement that Plaintiff state a vicarious liability theory as to Dolan for Plaintiff to proceed with a knowing beneficiary theory based at least in part on the knowledge he may have held and shared. A plaintiff may allege a vicarious liability theory without alleging a knowing benefit under a § 1595(a) beneficiary liability theory. *E.g. Doe v. Scottsdale Inns LLC*, No. 23 Civ. 00759 (PHX) (JJT), 2024 WL 3494375, at *4–6 (D. Ariz. July 22, 2024). And vice versa, she may allege a beneficiary liability theory without alleging a vicarious liability theory. *See, e.g.*, *Doe (S.A.S.) v. ESA P Portfolio LLC*, No. 3:23 Civ. 06038 (TMC), 2024 WL 3276417, at *7 (W.D. Wash. July 2, 2024) ("It is not that the manager's conduct is itself imputed as "participation" by Hilton in the trafficking venture, but rather that his conduct shows Hilton knew or should have known about S.A.S.'s trafficking."). These theories must be assessed separately under their respective standards. In other words, it is entirely possible that Dolan shared information with the Azoff Entities regardless of whether he served as their agent, and the factual pleadings require such a logical inference to be drawn on a motion to dismiss.

### B. Plaintiff Alleged Constructive Knowledge Concerning Dolan's Use of Fraud and Coercion

The District Court noted that the Azoff Defendants did not have knowledge that "force" or "coercion" was being used in Dolan's relationship with Plaintiff, but that is not the only way a claim for sex trafficking can be stated, nor was it the argument Plaintiff made against the Azoff Defendants. Here, Plaintiff has pleaded that she was lured to travel to Los Angeles to engage in commercial sex acts with Dolan by means of "fraud," which is an alternative to "force" or "coercion" in establishing a trafficking claim. 18 U.S.C. 1591(a) (referring to "means of force, threats of force, fraud, coercion described in subsection (e)(2), *or any combination of such means*") (emphasis added). In particular, Croft alleged that the Azoff Defendants fraudulently led her to believe that she was being brought to California to perform legitimate massage work for the Eagles and their staff, when in reality, she was flown out to satisfy Dolan's sexual demands.

Indeed, in its first opinion dismissing Plaintiff's claims, the District Court made the same error, and in doing so, acknowledged that Plaintiff had alleged that the Azoff Defendants knowingly engaged in fraud and deception, holding that "**Plaintiff plausibly alleges that the Azoff Defendants may have knowingly participated in the deception to get her to Los Angeles so that Dolan could have sex with her.**" 3-ER-417. And in its Second Order, the Court again acknowledged that the SAC alleged that "the Azoff Defendants were an integral part of the fraud

35

to get Plaintiff to agree to come to California." 1-ER-8. That "deception" is the same "fraud" that forms the basis of Plaintiff's TVPRA claim. The District Court thus erred in holding that Croft plausibly pleaded that the Azoff Defendants knew about the deception that was used to bring Croft to California for Dolan's sexual demands, but somehow did not have constructive knowledge of the same deception for purposes of the scienter requirement for beneficiary liability under the TVPRA.

Because Plaintiff alleged that the Azoff Defendants knowingly participated in Dolan's fraud—i.e., engaging in a commercial sex act under the guise of providing her with legitimate work opportunities as a licensed massage therapist—she has stated a claim for beneficiary liability under the TVPRA. The District Court's insistence that the Azoff Defendants knew of "force" or "coercion"—and not merely "fraud"—is inconsistent with the text of TVPRA, which includes "fraud" as a distinct basis of liability. *See United States v. Taylor*, 44 F.4th 779, 790 (8th Cir. 2022) (affirming a verdict where fraud was the basis for TVPRA liability).

Although the TVPRA does not define fraud, courts apply the word's ordinary meaning: "an instance or an act of trickery or deceit especially when involving misrepresentation." *United States v. Smith*, 719 F.3d 1120, 1125 (9th Cir. 2013) (quoting Webster's Third New International Dictionary 904 (2002)) (cleaned up); *see, e.g.*, *See Taylor*, 44 F.4th at 790 (affirming verdict that TVPRA criminal defendant engaged in fraud because he hired a woman to provide legitimate

36

massages while knowing his clients would expect her to provide sexual services); *Ardolf v. Weber*, 332 F.R.D. 467, 476 (S.D.N.Y. 2019) ("fraudulent promises and offers of career success" satisfied "fraud" element of a TVPRA claim); *Martinez v. 189 Chrystie St. Partners, LP*, No. 22 Civ. 3111 (VEC), 2023 WL 5390442, at *4 (S.D.N.Y. Aug. 22, 2023) ("force" includes "forced sexual activity with an employer or superior.").

The facts establish that the Azoff Entities "participated in the deception" that Dolan perpetrated on Croft, meaning that they should have known of "fraud" he used to cause a commercial sex act. As discussed above, the nature of the "deception" that the Azoff Entities participated in was that Croft was paid not to perform legitimate massage work, but to accede to the unwanted sexual advances of Dolan. The SAC sets forth multiple facts that support the Azoff Entities' knowledge of fraud here. For example, Plaintiff was housed in the same hotel as Dolan, but on all prior legs of the tour, she was provided accommodations with the band that she was hired to work for, the Eagles. Plaintiff further alleged that the Azoff Defendants knew that the Eagles did not need a massage therapist in California, and further alleged that when in California, she performed little to no actual massage services for which she was presumably hired. Yet the Azoff Entities arranged for Plaintiff's travel at Dolan's request and paid her for services she never actually provided to them. Combined with the Azoff Entities' close relationship with Dolan and the facts

37

pleaded concerning Croft's interactions with Dolan on previous legs of the tour, there are sufficient allegations that the Azoff Defendants knew or should have known that Croft was brought to California under the false pretense of employment while actually being sequestered in a hotel and caused to engaged in sex acts with Dolan.

The District Court also failed to draw reasonable inferences that the Azoff Defendants should have known that coercion was being used. The TVPRA embraces a broad definition of "coercion," which includes any "scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm." 18 U.S.C. § 1591(e)(2)(B). "[S]erious harm," means "any harm" including "financial, or reputational harm, that is sufficiently serious, under all the surrounding facts and circumstances, to compel a reasonable person of the same background and in similar circumstances to perform or continue performing commercial sexual activities." *Id.* § 1591(e)(5). Plaintiff alleged details about Dolan's leveraging of his power to influence her experience on the tour, and sufficiently alleged that the Azoff Defendants were in a position to know, and did know, that Dolan funded Plaintiff's trip to California. It is thus reasonable to infer that the Azoff Defendants should have known that Dolan would coerce Croft by leveraging her fear of "reputational" harm within the tour and "financial" harm from loss of pay and job opportunities from the Azoff Entities. Thus the District Court

38

erred in stating there was an "absence of facts that would have given the Azoff Defendants notice that Dolan was using coercion," 1-ER-9, as it ignores the inferences to be drawn from both the power imbalance between Croft and Dolan and the prior events alleged to be widely known from previous legs of the Eagles tour.

### C. Plaintiff Also Alleged Beneficiary Liability Based on a Theory of Agency/Vicarious Liability

The District Court also erred when it held that the SAC failed to allege either an actual or ostensible agency theory. 1-ER-9-11. The SAC alleged that Dolan's role on behalf of the Azoff Entities was to help develop the Forum venue in Los Angeles, 3-ER-384 (¶ 54), and to help manage the Eagles' tour, including deciding staffing matters, *id*. Dolan used his actual authority as an agent to have the Azoff Entities transport Croft to California, knowing he would use fraud, coercion and, if necessary, force on her, as he already had during the Miami leg of the tour. 3-ER-381 (¶ 43). Dolan transported Croft to serve as an employee-masseuse for the benefit of the tour which he was helping to arrange, while knowing that he would pressure her into unwanted commercial sex acts. 3-ER-387-88 (¶¶ 62, 64). The Azoff Entities empowered Dolan to help manage the tour and to use that power to employ and transport subordinates, including Croft. 3-ER-380-81, 386 (¶¶ 39[5]-40, 57).

---

[5]    This paragraph added significant additional illustration of Dolan's role working on behalf of the Azoff Entities and how that role directly impacted Croft.

The District Court misapplied the agency analysis and reached the wrong result. The Court was correct in recognizing that agency principles apply to TVPRA claims and that a principal must have power to "control" the agent. 1-ER-10. But the Court erred by holding that Dolan could not have been an agent of the Azoff Entities because he appeared to be in charge without answering to the Azoff Entities. *Id.* ("The SAC appears to allege both that Dolan had power over anyone related to the tour and also that Dolan operated as an agent of the Azoff Defendants.").

The Court also erred in holding that Dolan was not sufficiently under the Azoff Defendants' "control" to be their agent. In the context of agency, "control" refers to "the right to control," regardless of whether that right is exercised. As the Restatement of Agency explains, "[a] principal's failure to exercise the right of control does not eliminate [control]." Restatement (Third) Of Agency § 1.01. "To the extent the parties have created a relationship of agency . . . the principal has a power of control even if the principal has previously agreed with the agent that the principal . . . will not . . . interfere in the agent's exercise of discretion." Restatement (Third) Of Agency § 1.01 cmt. f. Put another way, "[i]t is not essential that the right of control be exercised . . . the existence of the right establishes the relationship." *People v. JTH Tax, Inc.*, 212 Cal. App. 4th 1219, 1242, 151 Cal. Rptr. 3d 728, 747 (2013) (citation to quoted case and quotation marks omitted). Were it otherwise,

agency law would reward principals who failed to rein in their agents, which is the implication of the Court's holding.

Since Croft does not have to allege or prove that the Azoff Defendants actually exercised control over Dolan, the allegation that Dolan hired and trafficked Croft while acting as a manager of the tour was more than sufficient to state a claim. *See Whisper Soft Mills, Inc. v. N.L.R.B.*, 754 F.2d 1381, 1386 (9th Cir. 1984) ("An essential characteristic of an agency is the power of the agent to commit his principal to business relationships with third parties."). It is far from a "speculative assumption" that Dolan was an agent of the Azoff Entities, given his responsibilities over hiring and disciplining employees of the tour. 1-ER-10. The Azoff Entities' actual governance arrangements, or their understandings with Dolan, both lie within the sole knowledge of Defendants and cannot be elucidated without discovery. *Vector Media S., LLC v. Starline Tours of Hollywood, Inc.*, No. 20 Civ. 6738 (DSF) (JC), 2020 WL 12035934, at *4 (C.D. Cal. Dec. 2, 2020) ("[w]hether the parties to an action had an agency relationship is an issue of fact.") (citation to quoted case omitted).

The Court also erred in brushing aside Croft's "apparent agency" theory with one sentence and without analysis. 1-ER-10. Apparent authority arises by "a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the

actor to be authorized and the belief is traceable to the manifestation." *Mavrix Photographs, LLC v. Livejournal, Inc.,* 873 F.3d 1045, 1055 (9th Cir. 2017) (quoting Restatement (Third) of Agency § 3.03). "Apparent authority results when the principal does something or permits the agent to do something which reasonably leads another to believe that the agent had the authority he purported to have." *Hawaiian Paradise Park Corp. v. Friendly Broad. Co.*, 414 F.2d 750, 756 (9th Cir. 1969). Such manifestations of agency "may consist of direct statements to the third person . . . or the granting of permission to the agent to perform acts . . . under circumstances which create in him a reputation of authority in the area in which the agent acts." *Id.* at 756. The crux of the inquiry is whether the acts made possible by the manifestation "constitute the tort or enable the agent to mask its commission." Restatement (Third) Of Agency § 7.08 cmt. b.

Croft's initial understanding, based on the actions of official Azoff Entity employees, was that she was employed by the Azoff Entities to work for the Eagles. 3-ER-382-83 (¶¶ 48-51). The Azoff Entities then represented to her that it was in fact Dolan paying for her presence, *id.* (¶ 48), and allowed both Dolan and his tour manager to make arrangements for Croft, including paying for her travel. 3-ER-388-89 (¶ 66). It was also Croft's understanding that Dolan could fire her—or otherwise use his power over the tour to make her life miserable—that led her to accede to his unwanted sexual advances. *Id.* (¶ 67). This was more than sufficient to state an

apparent agency theory, and the Court should not have rejected this alternative basis for concluding that Dolan was the Azoff Defendants' agent.

Finally, the District Court held in a footnote that the Azoff Entities would in any case be shielded from the consequences of Dolan's bad acts as an agent because of the "adverse interest exception." Second Order at 7-8 n. 4. As the Court observed, "[u]nder this exception, an agent's actions or knowledge are not imputed to the principal when the agent acts solely for his own purposes." *Id.* at 8 n. 4. To begin, this is not an issue suitable to be decided at this early stage. *See In re Amergence Tech., Inc.*, No. 2:12 BK 35473 (RK), 2016 WL 4069550, at *3 (Bankr. C.D. Cal. July 27, 2016) (observing that the "exception is fact-intensive and should not be generally resolved at the pleading stage.") In any case, the adverse interest exception is inapplicable where, as here, a third party relies on the representation of authority, as Croft relied on the Azoff Entities' legitimizing representations that Dolan could hire, fire, and direct its employees. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015). Finally, Dolan simply did not act "adversely" to the Azoff Entities, except in the trivial sense that they may be held liable for his conduct—which of course cannot be the test, as it would swallow the rule. *See In re Maui Indus. Loan & Fin. Co.*, 88 F. Supp. 3d 1175, 1186 (D. Haw. 2015) ("any harm from the discovery of the fraud—rather than from the fraud itself—does not bear on whether the adverse interest exception applies. The disclosure of corporate fraud

43

nearly always injures the corporation.") (citation to quoted case omitted). Instead, Dolan hired, transported, and retained Croft to benefit the Azoff Entities with her employment, and the Azoff Entities happily went along to appease Dolan. None of these actions were truly "adverse" to the Azoff Entities, and the exception therefore does not apply. *See Jenni Rivera Enterprises LLC v. Cintas Acuario Inc*., No. 2:23 Civ. 07847 (SB) (JC), 2024 WL 4799117, at *8 (C.D. Cal. Oct. 28, 2024) (court rejected evidence of mere misconduct as inapplicable to proving the existence of an "adverse interest.").

## <u>CONCLUSION</u>

Because Plaintiff adequately pleaded a commercial sex act, her sex trafficking claim for perpetrator liability against the Dolan Defendants should be reinstated. And because Croft also stated a sex trafficking claim for beneficiary liability against the Azoff Defendants, those claims should also be reinstated, as well as Plaintiff's state court claims that the District Court dismissed for lack of supplemental

jurisdiction. This Court should reverse the District Court's decision below and allow Croft's claims to proceed to discovery.

Dated: January 3, 2025

Respectfully submitted,

By: _Meredith Firetog_

**WIGDOR LLP**
Douglas H. Wigdor
Meredith A. Firetog
85 Fifth Avenue, Fifth Floor
New York, NY 10003
Telephone: (212) 257-6800
dwigdor@wigdorlaw.com
mfiretog@wigdorlaw.com

**LAW OFFICE OF KEVIN MINTZER, P.C.**
Kevin Mintzer
1350 Broadway, Suite 1810
New York, New York 10018
km@mintzerfirm.com
llk@mintzerfirm.com

**GIRARD BENGALI, APC**

Omar H. Bengali
355 S Grand Avenue, Suite 2450
Los Angeles, California 90071
Telephone: (323) 302-8300
obengali@girardbengali.com

*Attorneys for Appellant Kellye Croft*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)**  | 24-6150

The undersigned attorney or self-represented party states the following:

( • )  I am unaware of any related cases currently pending in this court.

(  )  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

(  )  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | /s/ Meredith A. Firetog    **Date** | Jan 3, 2025

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 17**                                                                 *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-6150

I am the attorney or self-represented party.

**This brief contains** | 11,132 | **words,** including | 0 | words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

🔘 complies with the word limit of Cir. R. 32-1.

⚪ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⚪ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

⚪ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

⚪ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

⚪ complies with the length limit designated by court order dated _____.

⚪ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Meredith A. Firetog | **Date** | January 3, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*